331 So.2d 157 (1976)
Pamela Belote GRAY, Individually and on behalf of her minor daughter, Martle Jo Gray, Plaintiff-Appellee,
v.
W. D. ATKINS, Jr., Defendant-Appellant.
No. 5333.
Court of Appeal of Louisiana, Third Circuit.
April 14, 1976.
Rehearing Denied May 19, 1976.
Writ Refused July 2, 1976.
*159 Ben E. Atkins, Baton Rouge, for defendant-appellant.
Domengeaux & Wright, by Bob F. Wright, Lafayette, for plaintiff-appellee.
Before HOOD, GUIDRY and PETERS, JJ.
HOOD, Judge.
This suit was instituted by Mrs. Pamela Belote Gray, individually and as natural tutrix of her minor daughter, Martie Jo Gray, to recover funds alleged to have been wrongfully withheld from her by defendant, W. D. Atkins, Jr. The funds which plaintiff seeks to recover were paid to defendant Atkins, as attorney for Mrs. Gray and her daughter, in settlement of the latters' claim resulting from the death of plaintiff's husband, Thomas Edward Gray. Defendant answered denying liability, and he reconvened for damages, alleging as grounds therefor that certain letters written by plaintiff constituted "defamation and malicious persecution" of defendant.
The trial judge rendered judgment in favor of plaintiff, individually, for $60,500.00, and in favor of plaintiff, on behalf of her minor child, for the additional sum of $15,000.00. Defendant's reconventional demand was dismissed. Defendant Atkins appealed.
The issues presented are: (1) Are the contracts purportedly entered into between plaintiff and defendant on April 30, 1974, and on February 3, 1975, valid and enforceable? (2) Is defendant entitled to withhold or to recover attorney's fees, and other amounts claimed, from the funds which were received by him in settlement of plaintiff's claim, and if so, how much should be allowed for those items? (3) Is defendant entitled to recover damages under his reconventional demand? (4) Did the trial court err in proceeding to trial in defendant's absence?
Thomas Edward Gray died on January 24, 1974, as the result of an accident which occurred while he was working on an offshore oil platform. He left as his sole survivors his widow, Mrs. Pamela Belote Gray, plaintiff in the instant suit, and her minor child, Martie Jo Gray.
On February 13, 1974, or about three weeks after the death of Mr. Gray, plaintiff was called on in her home by Elton Joseph Dugas and Linus J. "Mike" Mire, who advised her that she probably had a legal claim resulting from the death of her husband, and an offer was made to investigate the matter for her. Dugas and Mire were private investigators, and Dugas was operating under the trade name of "Dugas Detective Agency." Mire worked with and was employed by Dugas from time to time. During the course of the above visit, Mrs. Gray signed a document, dated February 13, 1974, which provides:
"I hereby employ Dugas Det. Agency to do a full investigation on the accident that cause the death of my husband Thomas Gray. The accident happened on Jan. 24, 1974.
"The fee to be $100.00 per day plus expense.
"I Pam Gray also ask Mr. Dugas to recommend an attorney to represent me and my daughter Martie Jo Gray."
The above agreement was written in longhand by Dugas, and it was then signed by Mrs. Gray. Dugas and Mire are not attorneys, neither of them ever having been admitted to the practice of law.
Dugas and Mire then left Mrs. Gray's home, but they returned later that day, *160 February 13, accompanied by Lucius A. Hornsby, Jr., an attorney who was practicing in Lafayette. While they were there a "Contract of Employment" was entered into between Mrs. Gray and Mr. Hornsby, under the terms of which plaintiff engaged Hornsby to represent her in connection with her claim arising out of the death of her husband. That contract was typewritten, it was dated February 13, 1974, and it stipulated that Mrs. Gray was to pay Hornsby a fee of "1/3 of recovery" for the legal services to be performed by him.
About two months later, in April, 1974, Dugas and Mire again called on Mrs. Gray, and informed her that Hornsby was not handling her claim properly. Dugas then recommended that she change attorneys, suggesting that she engage defendant, W. D. Atkins, Jr., a practicing attorney in Lafayette, to handle the case for her. He told plaintiff that Atkins' fee would be the same as that charged by Hornsby, that is one-third of the amount collected, and that plaintiff would not owe Hornsby anything. Atkins was contacted by telephone, and plaintiff agreed to employ him to represent her in connection with the above claim. Dugas and Mire thereupon presented to Mrs. Gray a printed form, labeled "Attorney Contract of Employment with an Interest," and plaintiff signed it. There were several blanks in that form, in which there could be inserted the names of the parties, a description of the claim or cause of action, the date of the agreement, and other provisions of the contract. None of the blanks were filled in on the contract when plaintiff signed it. Neither her name nor that of Atkins appeared in the form which she signed, and it did not specify the cause of action which the attorney was supposed to handle for her.
Dugas and Mire left with the form which plaintiff had signed, and some time later, out of Mrs. Gray's presence the blanks on that form were filled out and Atkins recorded the completed contract in the office of the Clerk of Court for Lafayette Parish on May 10, 1974. The contract, as completed and recorded, was dated April 30, 1974. It provided that plaintiff was the "client" and Atkins was the "attorney," and that Atkins was to handle Mrs. Gray's claim arising out of the death of her husband. It stipulated that Atkins was to receive attorney's fees for services to be performed by him ranging from one-third to one-half of the gross amount collected. There also was added to the contract a special provision, identified as Paragraph 9, which reads as follows:
"This contract is subject to the additional conditions, to wit: `attorney' is hereby authorized to withhold those sums advanced by `client's' previous attorney, Lucias A. Hornsby, Jr., and those expenses incurred by him, from any settlement or judgment. It is further understood that `client' owes no additional fee to Lucias A. Hornsby, Jr., than that set out above, and is fully released by said Lucias A. Hornsby, Jr., from his previous contract, and said contract is null and void."
Immediately under Paragraph 9, above quoted, there appear the words "Approved and Agreed To:" and that is followed by a signature which purports to be that of Lucius A. Hornsby, Jr.
There was a sharp conflict in the testimony of the witnesses, and particularly in the testimony of the two attorneys involved, relating to the above contract. Atkins testified that Hornsby signed the contract, specifically approving and agreeing to Paragraph 9, in Atkins' presence and in the presence of Atkins' secretary who signed as one of the witnesses to that document. Hornsby categorically denies that he signed the agreement. He stated that the signature appearing on that document is a forgery.
Hornsby also testified that Atkins called him some time after Hornsby began to represent plaintiff and advised that Hornsby was no longer Mrs. Gray's attorney, because she had hired Atkins to handle the *161 case for her. We gather from Hornsby's testimony that this information came as a surprise to him. According to his testimony, he thereupon told Atkins that he would protect his fees. We assume that the above conversation took place on or after April 30, 1974, that apparently being the date on which Mrs. Gray first informed Dugas and Mire that she would hire Atkins to handle the case. The record shows, however, that on March 26, 1974, more than a month before Mrs. Gray supposedly hired Atkins, Hornsby wrote to Atkins advising him that Atkins was to have the Pamela Gray case and that he would owe Hornsby no referral fee. The record also shows that on April 5, 1974, a written agreement was entered into between Atkins and Hornsby relating to eleven cases in which Hornsby theretofore had been serving as attorney for the claimants. Under that agreement Atkins was to "have" seven of those cases, one of which was the "Pamela Gray" case. Hornsby was to retain three cases, and the fee to be collected in the eleventh or remaining case was to be split evenly between the parties. The agreement provided that in the cases being handled by Atkins, including the "Pamela Gray" case, there was to be no "referral fee or any other fees" paid to Hornsby. The testimony thus is conflicting and confusing as to what actually transpired between Hornsby and Atkins relative to this case.
The evidence shows that all of the cases which were divided between Atkins and Hornsby pursuant to the above agreement were cases in which the claimants had employed Dugas originally to investigate their claims and to recommend attorneys to handle the legal work. In each such case Dugas had recommended, hired or engaged Hornsby initially to handle the case for Dugas' "client." In March or early April, 1974, however, Dugas severed his relationship with Hornsby and began working regularly for Atkins. It was after that change was made that Dugas recommended to plaintiff that she remove the case from Hornsby and engage Atkins to handle it for her. It is apparent that after Dugas began working regularly for Atkins he arranged for at least seven of Dugas' "clients" to discharge Hornsby and to engage Atkins as their attorney to handle their claims. The claim of Mrs. Gray was one of those which was transferred to Atkins. Dugas testified that "they were my clients," and that "I told Hornsby to turn them loose."
In May, 1974, Atkins handled the legal proceedings necessary to have plaintiff appointed administratrix of the succession of her deceased husband. In October of that year he instituted suit in behalf of plaintiff and her child against Pennzoil United, Inc., in the United States District Court for the Western District of Louisiana. Two interventions were filed in that suit. One was by the parents of the decedent, Thomas Edward Gray, claiming an interest in the damages which might be awarded resulting from the death of their son. The other intervention was filed by Hornsby, alleging that he is entitled to one-third of any amount collected as attorney's fees.
On or about February 3, 1975, Mrs. Gray entered into a compromise agreement with Pennzoil, the defendant in the above suit, settling her claim which resulted from the death of her husband. The case thus never came up for trial. Pursuant to that compromise, defendant paid $82,500.00 to plaintiff. Of that sum, $15,000.00 represented the amount due plaintiff's minor daughter, Martie Jo Gray, and the balance of $67,500.00 represented the amount due plaintiff, individually.
The record shows that on February 3, 1975, plaintiff went to Atkins' office for the purpose of executing all of the papers needed to effect the settlement of her case. While she was in Atkins' office on that date the following pleadings and documents were executed:
(1) The pleadings and documents necessary to have plaintiff appointed as Tutrix of her minor child and to have the settlement approved by the court were executed. *162 Pursuant to those pleadings, Mrs. Gray was appointed as Tutrix for her child, and Dugas was appointed to serve as Undertutor for the child.
(2) A "Receipt, Release and Indemnification Agreement" was executed by Mrs. Gray, dated February 3, 1975. By that agreement plaintiff acknowledged receipt of the above amounts, granted a full discharge to all parties of any further claims resulting from her husband's death, and she agreed to indemnify and hold harmless the parties therein released from any claims arising out of that accident.
(3) A separate document dated February 3, 1975, was executed by Mrs. Gray and by Atkins, providing in substance that Atkins had explained the settlement agreement to Mrs. Gray, and that the latter understood it.
(4) An "Agreement," dated February 3, 1975, and identified in the record as "Exhibit 29," was signed by Atkins and Mrs. Gray. In that instrument Mrs. Gray purportedly agreed that Atkins "shall retain the entire proceeds of the settlement until such time as all other claims herein are disposed of finally," that Mrs. Gray will indemnify Atkins for any amounts which he may be required to pay to the intervenors, that Atkins is "authorized to invest any funds belonging to the said Pamela B. Gray at interest at no less than 8% per annum at his discretion," that Atkins agrees to pay to Mrs. Gray "the sum equal to the amount that she was receiving under the Longshoremen and Harbor Worker's Act," that Atkins "may advance to her such sums as he deems appropriate under the circumstances," and that "Pamela B. Gray agrees to hold W. D. Atkins, Jr., harmless for any loss of the principle due her as the result of the decrease in value of the investment if any be made for any reason." Attached to that agreement is a "Concurrence," signed by Dugas as Under-tutor for the minor child, in which he concurs in and agrees with the above agreement.
When Mrs. Gray went to Atkins' office on February 3 to execute the documents needed to complete the settlement, Atkins was not there. Dugas was in the office, however, and he had plaintiff sign all of the above papers. After she signed them, Dugas took the papers next door to have some of them notarized, and then he went with Mrs. Gray to the courthouse to assist her in completing the settlement. Upon their arrival at the courthouse, they met counsel for the defendant, Pennzoil, who advised them that it would be necessary for Atkins to be present also. Dugas thereupon called Atkins by telephone and had him come to the courthouse. After Atkins arrived the settlement was completed and a judgment was obtained dismissing the suit which had been filed in the Federal Court. A draft for $82,500.00, made payable to the order of Mrs. Gray and Atkins, was handed to Atkins at that time.
Mrs. Gray testified that when she went to Atkins' office to execute the papers necessary to complete the settlement, Dugas had a "whole bunch of papers" for her to sign, and that he did not give her an opportunity to read those papers, stating that they didn't have time. She called her grandfather who came immediately to the office, but she said that Dugas took the papers away from her grandfather and would not let him read them. Mrs. Gray did not know that she had signed the document identified as Exhibit 29, in which she purportedly authorized Atkins to retain the proceeds of the settlement until other claims were paid, or in which she agreed to indemnify Atkins for amounts he might be required to pay to intervenors. She stated that she never saw such an agreement until after this suit was filed.
The testimony of Dugas confirms that of Mrs. Gray with reference to the execution of the above agreement. Dugas stated that neither plaintiff nor her grandfather had an opportunity to read any of the papers which Mrs. Gray signed that day, explaining that "it would take a half a day to *163 read all of the papers." He testified that plaintiff never read the agreement identified as "Exhibit 29," that "she just kept on signing all the papers that was put in front of her," that no one told her "what it was all about," that the agreement identified as Exhibit 29 was "in the papers to be signed," and that in his opinion, Atkins did not want plaintiff to see that document before she signed it. As already noted, Dugas also signed that agreement as Undertutor for plaintiff's minor child, concurring in that agreement, although he was aware of the fact that plaintiff did not know that she had signed such a document.
We have concluded that Mrs. Gray's signature on the above agreement, dated February 3, 1975, and identified as Exhibit 29, was fraudulently obtained. The existence and provisions of that agreement were purposely concealed from plaintiff, and she was not aware of the fact that she had signed such a document until several weeks later. She signed it upon the false representation that it was one of the documents required to complete the settlement. We hold that since the signature of Mrs. Gray was obtained by fraud, she did not consent to the agreement and that that agreement thus is null and void. LSA-C.C. art. 1847; Cole v. Lumbermen's Mutual Casualty Company, 160 So.2d 785 (La.App. 3 Cir. 1964); Fidelity Credit Company v. Bradford, 177 So.2d 635 (La. App. 3 Cir. 1965).
Immediately after the draft for $82,500.00 was handed to Atkins, the latter told Mrs. Gray that the check would have to be held for fifteen days before the money could be disbursed. Plaintiff thereupon endorsed the check and allowed Atkins to retain it. The record shows that Atkins also received an additional sum of money as settlement of another claim which plaintiff had resulting from the death of her husband.
Despite repeated demands made by plaintiff, she alleges that she has been paid only the sum of $6,000.00 by defendant.
This suit was instituted on March 5, 1975. Plaintiff demands judgment against defendant for $82,500.00, less the $6,000.00 which she concedes was paid to her, and less any reasonable attorney's fees to which defendant may be entitled.
Defendant Atkins answered, alleging that he received $89,517.73 in settlement of all of plaintiff's claims, that he is entitled to retain one-half that amount, or $44,758.86, as attorney's fees, and that he is entitled to withhold the additional sum of $24,386.46 as reimbursement for advances made and expenses incurred in connection with this matter, leaving a net balance due plaintiff of $20,373.40. He contends that he is entitled to retain even that net balance due plaintiff until the claim of Hornsby for attorney's fees is settled. Atkins also contends that he is entitled to recover damages from plaintiff under his reconventional demand, and to offset the amount due him as damages from the amount which he may owe Mrs. Gray.
As already noted, the trial judge rendered judgment in favor of plaintiff and against defendant for the aggregate sum of $75,500.00, and he rejected defendant's reconventional demands. He did not assign reasons for that judgment.
We have concluded for reasons already assigned that the "Agreement" between plaintiff and Atkins, identified as "Exhibit 29," dated February 3, 1975, is null and void, because of the lack of consent on the part of Mrs. Gray, her signature to that document having been obtained fraudulently.
Another important question presented is whether the "Attorney Contract of Employment with an Interest," entered into between Mrs. Gray and Atkins on April 30, 1974, is valid and enforceable. We have concluded that that contract was executed in violation of a prohibitory law, and that it also is void.
*164 LSA-R.S. 37:213 provides in part that:
"No natural person, who has not first been duly and regularly licened and admitted to practice law by the Supreme Court of this state, no partnership except one formed for the practice of law and composed of such duly licensed natural persons, and no corporation or voluntary association except a professional law corporation organized pursuant to Chapter 11 of Title 12 of the Revised Statutes, shall:
"(1) Practice law;
"(2) Furnish attorneys or counsel or an attorney and counsel to render legal services;
* * * * * *
"(4) Render or furnish legal services or advice;
"(5) Assume to be an attorney at law or counselor at law;"
Dugas and Mire advised Mrs. Gray on February 13, 1974, that she had a legal claim arising out of the death of her husband, and that advice was given in the hope that she would employ them to assist her in prosecuting that claim. We think that constituted the furnishing of legal advice. Following that advice, and obviously relying on it, Mrs. Gray signed a document on that date, authorizing Dugas to "do a full investigation on the accident" for a consideration of $100.00 per day plus expenses, and "to recommend an attorney" to represent her and her daughter. We find no legal objection to Dugas' agreement to investigate the accident for Mrs. Gray, and we make no holding as to the legality of her authorization for Dugas "to recommend an attorney." In the instant suit, however, the evidence convinces us that the parties intended by that agreement that Dugas was to render legal services, or to furnish an attorney or counsel to render such services, for plaintiff.
On the same day that Dugas first contacted plaintiff, he returned to plaintiff's home accompanied by the attorney whom he had engaged to handle at least ten other cases. About two months later, Dugas advised plaintiff that the attorney he had "recommended" was not performing his work satisfactorily, and he "recommended" that she discharge that attorney and engage Atkins to handle the case for her. At the time that recommendation was made, Dugas furnished plaintiff with a blank form of contract for her to sign engaging an attorney and the blanks on that contract were filled out later to show that she engaged Atkins to represent her.
Dugas testified that Mrs. Gray, as well as other claimants who had engaged him to investigate their claims, were his "clients." With reference to the cases which he referred to Atkins, he said "I told Hornsby to turn them loose," and that he had Atkins "take over the Gray case."
Dugas worked for Atkins from March, 1974, until some time after Mrs. Gray's case was settled in April, 1975. During all of that time, he maintained his headquarters in Atkins' office, he answered the telephone for Atkins and he handled legal matters for at least one client, that being Mrs. Gray. Dugas was authorized to sign checks making withdrawals from Atkins' checking account in one bank, and Dugas testified that when almost all of the money was gone out of that bank, Atkins "would sign me some blank checks in case I would need something." He wrote a check on Atkins' account for $400.00 payable to Mrs. Gray, because she owed "some rent or a doctor bill or something." Atkins paid Dugas a salary of $600.00 per week while the latter worked in his office, and Atkins stated that he also paid Dugas other sums "on a case by case basis."
Dugas testified that he worked in Atkins' office "because he (Atkins) would not show up," that he was "running the office" for Atkins, or "some of it anyhow," and that Atkins asked him to "handle the settlement portion" of Mrs. Gray's case.
*165 Mrs. Gray testified that after she engaged Atkins to handle her case she "tried a bunch of times" to talk to Atkins at his home and at the office, and that she was unable to contact him, but that she was able to contact Dugas in Atkins' office. She also testified that when her case was settled she received a call from Dugas to go to Atkins' office to sign the papers needed to effect the settlement. When she arrived at that office, Atkins was not present, but Dugas was there and he handled the signing of all of the settlement papers, as well as the other documents above described.
Atkins, in a deposition taken before the trial, confirmed the fact that Dugas was employed by him during the above period of time, that he "stays" at Atkins' office, that he answers the telephone for Atkins "from time to time when the secretary doesn't show up," and that he asked Dugas to have the settlement papers signed by plaintiff. He stated that he had Dugas appointed as Under-tutor for Mrs. Gray's child because "he just happened to be available at the time," although plaintiff's grandfather was there. Atkins also testified he paid Dugas $5,230.00 for investigating the Gray case, and he claims that he is entitled to be reimbursed that amount in addition to the attorney's fee claimed by him. Atkins said he paid that amount to Dugas about August 1, 1975, and that he paid Dugas other fees on other cases, paying him "on a case by case basis."
Atkins stated in his deposition that he deposited the sum of $20,373.40, that being the amount he admits owing plaintiff, in a safety deposit box in the Rayne Bank & Trust Company, which is in Dugas' name. He maintains that the money is still in that bank box. .He said he checked with the president of the bank by telephone on the day of the trial and determined that the money was still there.
Dugas categorically denies that any money was deposited in a bank box in his name. He states that he does business with another bank in Rayne, and he has a safety deposit box there, but that he has never held any money for Atkins in that or any other box. He denies that he holds any money for Atkins or for Mrs. Gray. Dugas also indicated that Atkins did not have the money to pay Mrs. Gray, and that he colluded with Hornsby to intervene in the suit in order to give him more time within which to obtain funds to pay his client.
We think Dugas was engaged in the "practice of law," in violation of the provisions of LSA-R.S. 37:213, on February 13, 1974, when he entered into an agreement with Mrs. Gray to investigate her claim for her, and on April 30, 1974, when Mrs. Gray entered into a contract with Atkins authorizing the latter to represent her in connection with that claim. The evidence also convinces us that Atkins actively assisted and conspired with Dugas in the latter's illegal practice of law, and that the contract between plaintiff and Atkins, dated April 30, 1974, was entered into pursuant to that illegal relationship.
Articles 11 and 12 of the Louisiana Civil Code provide, in part, that:
"Art. 11. Individuals can not by their conventions, derogate from the force of laws made for the preservation of public order or good morals.
* * * * * *
"Art. 12. Whatever is done in contravention of a prohibitory law, is void, although the nullity be not formally directed."
Our law provides that an obligation without a cause, or with a false or unlawful cause, can have no effect. LSA-C.C. art. 1893. The cause is unlawful, when it is forbidden by law, when it is contra bonos mores (contrary to moral conduct) or to public order. LSA-C.C. art. 1895.
*166 The actions of Atkins and Dugas in conspiring to practice law together when Dugas was not legally authorized to do so is contrary to the preservation of public order or good morals, and any contracts entered into by them pursuant to that illegal relationship are illegal and void. The agreement entered into between Mrs. Gray and Atkins on April 30, 1974, therefore, is null and void as being in contravention of a prohibitory law and contra bonos mores.
Since the contracts which plaintiff entered into with Dugas and with Atkins are invalid, we conclude that defendant Atkins is not entitled to recover attorney's fees for the services which he may have rendered in connection with plaintiff's claim resulting from the death of her husband. Plaintiff concedes that Atkins has paid her $6,000.00 from the funds which he collected. The trial judge obviously considered that fact, since the amount which he awarded plaintiff is substantially less than the sum which was paid to Atkins in settlement of her claim. Plaintiff has not appealed or answered the appeal, so we do not have to consider the question of whether the award made to her can or should be increased.
We have considered the claims made by Atkins for reimbursement of alleged advances made and expenses incurred by him in connection with plaintiff's cause of action. The testimony is conflicting as to each of the items claimed, however, and we have concluded, as the trial judge apparently did, that the evidence fails to support defendant's reconventional demand for reimbursement of those alleged advances or expenses.
Defendant also contends in his reconventional demand that letters were written by Mrs. Gray containing defamatory materials which have caused him to sustain damages. No such letters were introduced into evidence. Atkins argues, however, that the institution of this suit and the publication of news items about it in local newspapers provoked an investigation by the Ethics Committee of the Louisiana State Bar Ausociation, and that that has caused him to suffer damages in substantial amounts.
We have concluded that the allegations contained in plaintiff's petition are correct, and that she is entitled to recover the amount claimed by her. The fact that news items were published, indicating that such a suit has been instituted, does not give defendant a cause of action to recover damages from plaintiff for defamation of character.
Defendant contends, finally, that the trial court erred in refusing to grant defendant's motion for a continuance, and in ordering the trial to proceed on June 20, 1975, in the absence of defendant.
Initially the case was scheduled for trial on May 13, 1975. Defendant filed a motion for a continuance on May 9, and another such motion was filed on the morning of May 13, 1975. The trial court granted the continuance, and the case was rescheduled to be tried on June 20, 1975. When the case came up for trial on that date, neither Atkins nor his counsel were present. A motion for a continuance was not filed at that time, and the court authorized plaintiff to proceed with the trial in defendant's absence.
After judgment was rendered, defendant filed a motion for a new trial, alleging as one ground for that relief that he had not had an opportunity to prepare a defense. He alleged that on April 16, 1975, his house was severely damaged by fire, numerous files were damaged and lost in that fire, that no depositions were furnished by *167 the court reporter, that Dugas was attempting to destroy the business, finances and personal reputation of defendant in view of the fact that Atkins "terminated any affiliation with said Dugas" on April 21, 1975, and that defendant lacked secretarial or legal assistance in preparing a defense to this suit.
All of the facts alleged in the motion for a new trial occurred before the case was scheduled for trial originally, and most of those grounds were urged in the motions for continuance which were filed prior to or at the time scheduled for that trial. The trial judge obviously considered all of those circumstances when he granted a continuance on May 13 and refixed the case for trial on June 20, 1975. He also must have considered all of those allegations again when he denied defendant's motion for a new trial.
We have reviewed the record, and have concluded that the trial court did not abuse its discretion in ordering that the trial proceed on June 20, 1975, despite the fact that neither defendant nor his counsel appeared at that trial. See Gillentine v. McLeod, 70 So.2d 384 (La.App.Orl.1953); Williams v. Fontane, 175 So.2d 686 (La. App. 1 Cir. 1965); Stablier v. Partin, 278 So.2d 537 (La.App. 1 Cir. 1973).
For the reasons herein set out, the judgment appealed from is affirmed. The costs of this appeal are assessed to defendant-appellant.
AFFIRMED.