440 So.2d 106 (1983)
LOUISIANA STATE BAR ASSOCIATION
v.
W.D. ATKINS, Jr.
No. 82-B-0739.
Supreme Court of Louisiana.
October 17, 1983.
Rehearing Denied November 18, 1983.
Thomas O. Collins, Jr., Richard A. Deas, Wood Brown, III, New Orleans, Robert J. Boudreau, Lake Charles, Sam J. D'Amico, Baton Rouge, Carrick R. Inabnett, Monroe, Harold J. Lamy, New Orleans, Alfred S. Landry, New Iberia, Philippi P. St. Pee, Metairie, Roland J. Achee, Shreveport, Gerard F. Thomas, Jr., Natchitoches, for applicant.
Jacob J. Amato, Jr., Gretna, for respondent.

DISCIPLINARY PROCEEDING
CALOGERO, Justice.[*]
The Louisiana State Bar Association, appearing through its Committee on Professional Responsibility, instituted this disbarment proceeding against W.D. Atkins, Jr. by Petition filed on January 18, 1977. The Commissioner appointed by this Court to receive the evidence concluded that two of the charges of misconduct were supported by the record. The Committee concurred in the Commissioner's findings as well as his recommendation for a retroactive disbarment and immediate eligibility for reinstatement.[1] A careful review of the record convinces us that the Commissioner was correct in finding that two of the specifications of misconduct are supported by the evidence.
The more serious of the two charges of misconduct came to the attention of the Bar Association when in February of 1975 an attorney in Lafayette forwarded to the Louisiana State Bar Association a letter in which he indicated that Ms. Pamela Gray, a former client of respondent Atkins, was having problems collecting from Atkins her share of the proceeds of a tort settlement. Atkins had represented Ms. Gray and her *107 minor son in a wrongful death claim arising out of the accidental death of her husband. This claim had been settled and a draft in the amount of $82,500.00 payable to Ms. Gray and Atkins had been deposited into one of respondent's several bank accounts on February 3, 1975. Three checks totalling $6,600.00 were drawn on this account and given to Ms. Gray between February 4, 1975, and February 18, 1975. Convinced that respondent was wrongfully withholding the remainder of the settlement proceeds due her, Ms. Gray sought the advice of another attorney.
On March 5, 1975, the new attorney filed a lawsuit on behalf of Ms. Gray and her minor son in which they sought payment of money owed from the settlement. The trial judge rendered a judgment in the amount of $75,500.00 against Atkins. That judgment was affirmed by the Court of Appeal. Gray v. Atkins, 331 So.2d 157 (La.App. 3rd Cir.1976), cert. denied, 334 So.2d 433 (La. 1976).
On July 17, 1975, the Lafayette Parish Grand Jury indicted Atkins for theft of $20,373.40 in connection with the Pamela Gray matter.[2] As a result of various complaints against Atkins, the Committee on Professional Responsibility held a formal investigatory hearing on July 30, 1976. At that time charges of misconduct relating to the Pamela Gray incident were not considered since they were the subject of the ongoing criminal prosecution. On January 18, 1977, the Committee, in accordance with its findings at the July 30, 1976, hearing, filed a Petition for Disciplinary Action against respondent. Subsequently, in March of 1977, a Lafayette Parish petit jury convicted Atkins for theft of money belonging to Pamela Gray. Based on the conviction, this Court suspended Atkins from the practice of law on November 11, 1977. At that time Atkins and the Committee agreed that additional proceedings against him would be held in abeyance pending finality of the conviction. On September 2, 1980, the conviction of Atkins was reversed by the United States Fifth Circuit Court of Appeal. Atkins v. Listi, 625 F.2d 525 (5th Cir.1980).[3] After this reversal of the conviction, respondent's suspension was lifted and he was reinstated to the practice of law by this Court on February 19, 1981. He was not retried in the state district court on the theft charge.
At the time of his reinstatement, respondent was advised by the Committee that proceedings initiated prior to the criminal conviction and suspension would be resumed. In addition, the Committee drafted three supplemental charges, each of them relating to Pamela Gray, charges which had been deleted at the time of the July 30, 1976, hearing. Eventually a Commissioner appointed by this Court held hearings on February 22, and March 17, 1983, in connection with the specifications of misconduct. The two counts which were found to be supported by the evidence each involved instances of commingling clients' funds in violation of Code of Professional Responsibility Disciplinary Rule 9-102.
Specification Number One of the Supplemental and Amended Petition relates to the Pamela Gray incident. The respondent is charged with having received $82,500.00 on behalf of Ms. Gray and in settlement of her claims. It is alleged that, after making a partial disbursement of $6,600.00, Atkins commingled and converted to his own use the remaining portion of the funds due Ms. Gray.
It is clear from the evidence that respondent was in receipt of funds belonging to *108 Ms. Gray which money was not deposited into a separate client trust account. Instead, the proceeds were deposited into the respondent's own account from which he eventually withdrew all but $6,600.00 for his own use.
Specification Number Five involves the net proceeds of a settlement owed to a Mr. James D. Comeaux. That client's claim had been settled for $11,000.00, and in March of 1975, respondent issued a check to Mr. Comeaux in the amount of $6,719.90. Upon presentation of the check to the bank on which it was drawn, Mr. Comeaux was advised that there were insufficient funds for payment. The client was eventually paid by respondent's father after the complaint was filed with the Bar Association.
We are convinced by the record that there was sufficient evidence to support both of these charges of commingling.
An attorney is obligated to take due precautions to protect and preserve the funds of his clients. The Code of Professional Responsibility, under Disciplinary Rule 9-102, sets forth the following guidelines for the maintenance of client funds:
(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:
(1) Funds reasonably sufficient to pay bank charges may be deposited therein.
(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.
(B) A lawyer shall:
(1) Promptly notify a client of the receipt of his funds, securities, or other properties.
(2) Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable.
(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.
(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive. (LSA Vol. 37, Article XVI, Canon 9, Articles of Incorporation of Louisiana State Bar Association).
This Court has recognized that the misuse of a client's funds by an attorney represents one of the gravest forms of professional misconduct. Louisiana State Bar Association v. Selenberg, 270 So.2d 848 (La.1972). In Louisiana State Bar Association v. Van Buskirk, 249 La. 781, 191 So.2d 497 (La. 1966), we stated:
Because of their professional status, attorneys must adhere to a high standard of conduct in relations with their clients. The conversion of a client's funds is one of the most serious violations of an attorney's obligations.
This Court has repeatedly held that disbarment is the appropriate penalty for the misuse of a client's funds. Louisiana State Bar Association v. Armagnac, 424 So.2d 996 (La.1982) (Attorney received and deposited into his bank account succession funds belonging to certain clients. Final payments were made nearly two years after the attorney's receipt of the funds, while disciplinary proceedings were pending, and then only after some of the unpaid heirs had filed theft charges against him); Louisiana State Bar Association v. Philips, 363 So.2d 667 (La.1978) (Attorney disbarred after conviction for felony-theft based on a series of spurious settlements and commingling of *109 client's funds); Louisiana State Bar Association v. Weysham, 307 So.3d 336 (La.1975) (Several instances of misconduct relating to the attorney's failure to handle properly and to account for his client's funds, and of commingling client's funds with his own. Restitution was not made until just before a formal investigatory hearing by the Committee); Louisiana State Bar Association v. Selenberg, supra, (Attorney failed to account to clients for $21,500.00 collected in connection with a succession proceeding, and commingled this money with his own funds); Louisiana State Bar Association v. Haylon, 198 So.2d 391 (La.1967) (Attorney collected proceeds from the sale of property. That portion due the client, $2,742.00, was used by the attorney for his own personal obligations).
Respondent contends, however, that there are mitigating circumstances in the instant proceeding which tend to offset the gravity of his misconduct. In connection with the Pamela Gray matter, respondent entered into a compromise and paid $50,000.00 in settlement of the $75,500.00 judgment. $20,000.00 was paid in cash and a promissory note in the amount of $30,000.00 was satisfied on November 14, 1979. Restitution is a mitigating factor, but restitution does not always obviate the need for disciplinary action. Weysham, 307 So.2d at 338; Louisiana State Bar Association v. Klein, 253 La. 603, 218 So.3d 610 (La.1969). Respondent eventually paid Ms. Gray more than what he contends was owed to her from the settlement proceeds. However, this was not done until several years after the settlement proceeds were received and then only after disciplinary proceedings were instituted and judgment in a civil suit taken against him, and following a conviction for theft of the funds due Ms. Gray.[4]
Respondent testified that a variety of personal problems resulted in alcohol abuse for which he eventually sought professional help. There was evidence presented at the hearing which proved that respondent was receiving treatment in 1978 for an impaired emotional state. However, the record does not support a finding that respondent's mental disorder or drinking problem were connected to the misconduct which occurred in the early part of 1975.
Respondent contends that mitigating circumstances and attestations concerning his present fidelity should preclude imposition of disbarment. We disagree. Constrained by the severity of the offenses and the precedents of this Court, we have determined that the appropriate discipline which should be imposed is disbarment effective on the date of this decree.[5] We note, of course, that the respondent Atkins has already *110 been suspended from the practice of law for a total of thirty-nine months based upon conviction for the theft of the Gray settlement proceeds, a conviction which we earlier noted was reversed by the United States Fifth Circuit Court of Appeal. Because of this thirty-nine month suspension, we determine that respondent will be eligible to seek reinstatement twenty-one months hence rather than being required to wait five years as provided in Article 15, Section 12(a) of the Articles of Incorporation of the Louisiana State Bar Association.[6]

Decree
For the reasons assigned, it is ordered, adjudged and decreed that the name of W.D. Atkins, Jr. be stricken from the roll of attorneys and his license to practice law in Louisiana is cancelled. Respondent may apply for reinstatement twenty-one months from this date.
WATSON, J., concurs in the Commissioner's findings but would order a lengthy suspension instead of disbarment under the circumstances.
LEMMON, J., dissents in part and would adopt Commissioner's recommendation, in which the Bar Association Committee concurred.
BLANCHE, J., dissents for reasons assigned by LEMMON, J.
NOTES
[*] Julian Bailes, Justice ad hoc sitting for Associate Justice Walter F. Marcus, Jr.
[1] As will be more fully explained hereinafter, this Court suspended respondent from the practice of law on November 11, 1977, and reinstated him on February 19, 1981. Thus, he has already been denied the right to practice law for approximately three years and three months. The Commissioner noted that respondent has not practiced law since the time of his reinstatement. Article 15, Section 12(a) of the Articles of Incorporation of the Louisiana State Bar Association requires that a minimum of five years must elapse following disbarment before an attorney can apply for reinstatement. The Commissioner apparently felt that under the circumstances of this case a disbarment retroactive to the date of respondent's suspension would be more appropriate than a disbarment effective as of the present time.
[2] Ms. Gray's claim had been settled for a total of $89,517.73. According to Atkins' calculations he was entitled to one-half as attorney's fees and was entitled to withhold the additional sum of $24,386.46 as reimbursement for advances made and expenses incurred in connection with the case. This left a net balance of $20,373.40 due Ms. Gray, according to Atkins.
[3] Respondent had been convicted by a nonunanimous six-person jury. In Burch v. Louisiana, 441 U.S. 130, 99 S.Ct. 1623, 60 L.Ed.2d 96 (1979), the United States Supreme Court held unconstitutional those provisions of the Louisiana Constitution and Code of Criminal Procedure which had permitted conviction by a nonunanimous six-person jury for nonpetty offenses.
[4] Respondent testified at various times that he never intended to deprive Ms. Gray of her money and that he had sufficient assets available to pay her in full. The record reveals conflicting evidence in regard to this claim by Atkins. In a deposition taken in connection with the civil litigation instituted by Ms. Gray against Atkins, he stated that $20,373.40 due Ms. Gray had been placed in a safety deposit box at the Rayne Bank & Trust Company. There was no evidence, documentary or otherwise, to support this alleged action. During a formal investigatory hearing held on December 15, 1981, Atkins testified that he had had approximately $40,000.00 in cash which money was available to pay Ms. Gray. Atkins stated that most of this money had been given to his father to hold. At the March 17, 1983, hearing conducted by the Commissioner, Atkins' father testified that sometime in July or August of 1975, Atkins gave him $20,000.00 to hold. This money, according to Atkins' father, was eventually used as the cash portion of the $50,000.00 settlement between Ms. Gray and Atkins. The source of this $20,000.00 could not be traced to the settlement proceeds owed Ms. Gray in connection with the wrongful death litigation in which Atkins represented her. Assuming Atkins' contention to be true, i.e., that he maintained sufficient assets with which to pay Ms. Gray, this factor would not aid his defense to the charge of commingling client funds. As we noted earlier the fact that he commingled and converted to his own use settlement proceeds due Ms. Gray is clearly established by the record which reveals that the funds from which Ms. Gray was to be paid were deposited into a general account from which Atkins eventually withdrew all but $6,600.00 for business and personal expenses.
[5] As indicated at the outset of this opinion, the Commissioner appointed by this Court with whom the Committee concurred recommended retroactive disbarment and immediate eligibility for reinstatement.
[6] On the basis of the previously mentioned evidence of a drinking problem and mental disorder, the Commissioner recommended that respondent's reinstatement be granted only upon a clear showing that he is emotionally stable and able to resume the practice of law. At this time it is unnecessary for us to pass on the question of whether his emotional and drinking problems have been resolved; and/or whether respondent will be reinstated if and when he applies.